Filed 5/8/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| FORD MOTOR WARRANTY CASES | B277725 |
| _____ | |
| FORD MOTOR COMPANY, | JCCP No. 4856 |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| JOSE LUIS AGUILAR et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS in mandate.  Kenneth R. Freeman, Judge.  Petition granted.

Shook, Hardy & Bacon, Amir M. Nassihi, Paul B. La Scala and Brian P. Ziska for Petitioner.

No appearance for Respondent.

Kiesel Law, Paul R. Kiesel, Jeffrey A. Koncius; O'Connor & Mikhov, Steve Mikhov; Gieleghem Law Office, Neil Gieleghem; Strategic Legal Practices, Payam Shahian and Jared V. Walder for Real Parties in Interest.

_____

## SUMMARY

Code of Civil Procedure section 404.1 governs the conditions for coordination of civil actions.[1]  In February 2016, a coordination motion judge found that a coordination proceeding was appropriate for approximately 470 cases filed in nine California counties.  Six months later, the judge assigned as the coordination trial judge for those cases, applying the same statutory factors, refused to add to the coordination proceeding 467 substantively indistinguishable cases in the same counties, most of which had been recently filed.

In this writ proceeding, we conclude a trial judge's order declining to add cases to a coordination proceeding, like the coordination motion judge's original order, is subject to our independent review.  We further conclude the trial court erred in refusing to add the cases to the proceeding.  Accordingly, we grant the writ petition.

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2015, Ford Motor Company filed a petition for coordination of more than 775 cases in which plaintiffs in 44 counties across the state had sued Ford.  The actions alleged Ford breached warranties with respect to cars equipped with the "DPS6 transmission" (Ford Fiesta model years 2011-2015 and Ford Focus model years 2012-2015).  Ford contended the cases

_____

[1]     Further statutory references are to the Code of Civil Procedure.

2

met the criteria for coordination described in section 404.1 and court rules. Section 404.1 states:

> "Coordination of civil actions sharing a common question of fact or law is appropriate if one judge hearing all of the actions for all purposes in a selected site or sites will promote the ends of justice taking into account whether the common question of fact or law is predominating and significant to the litigation; the convenience of parties, witnesses, and counsel; the relative development of the actions and the work product of counsel; the efficient utilization of judicial facilities and manpower; the calendar of the courts; the disadvantages of duplicative and inconsistent rulings, orders, or judgments; and, the likelihood of settlement of the actions without further litigation should coordination be denied."

By order dated February 4, 2016, the coordination motion judge (Hon. Emilie Elias) found that a coordination proceeding was "proper and would benefit the goals of the Coordinated Cases" as to approximately 470 of the 775 cases, in nine (mostly southern) of the 44 counties. Judge Kenneth R. Freeman was designated the coordination trial judge, and the Second Appellate District was selected as the Court of Appeal.

Several plaintiffs sought a writ of mandate overturning the coordination order, describing the coordinated cases as "simple breach of warranty cases brought under California's lemon law—the Song-Beverly Consumer Warranty Act—that happen to have a common defendant-manufacturer. . . ." We summarily denied the writ petition on April 6, 2016.

The coordination trial judge issued an order on April 27, 2016, staying the coordination proceeding until the initial status

3

conference.  In a letter from court counsel, we were advised the stay is still in place and has not been modified.

In May 2016, Ford filed a petition to add 467 similar cases, most of which had been recently filed, to the coordination proceeding.  These "add-on" cases consisted of "(1) 408 recently filed cases served around or after the time Ford identified actions to include in its original Petition for Coordination filed on December 7, 2015 to the present; (2) 50 cases Ford inadvertently not included [*sic*] in the original petition; and (3) 9 cases previously excluded from Ford's original Petition due to a pre-April 15, 2016 trial date, which trial dates have since been continued."  (Ten days later, Ford withdrew 35 cases from the add-on cases as having been "settled and/or dismissed or otherwise should be withdrawn . . . ."  As of March 7, 2017, approximately 254 of the cases subject to the add-on petition had been settled or dismissed.)

Ford declared that all the add-on cases "assert a claim for breach of warranty regarding the 2011-2015 model-year Ford Fiesta and 2012-2015 model-year Ford Focus vehicles equipped with the DPS6 transmission," and were pending in one of the nine counties identified in Judge Elias's coordination order.  Ford asserted coordination was appropriate because the add-on cases "involve similar allegations and the same named defendant, Ford," and coordination would advance the convenience of the parties, witnesses and counsel, conserve judicial resources and avoid the risk of duplicative or inconsistent rulings, orders, and judgments.

At an initial status conference on June 15, 2016, the court continued the add-on motion to July 8, 2016, and ordered the parties to file a joint report on case categories, a discovery plan,

views on a protective order, and a proposed case management plan. The court stated it needed to know how many of the cases "are products liability cases versus Lemon Law cases." One of plaintiffs' counsel responded that there were "Lemon Law, Song-Beverly, warranty and fraud cases," but "I don't think there are any product cases." The chart prepared for the July 8, 2016 status conference confirmed there were no products liability cases already under coordination or among the add-on cases. The status conference set for July 8, 2016, was continued to July 29, 2016.

The court issued a tentative ruling denying Ford's petition for coordination of the add-on cases. At the hearing, the court summarized its reasoning this way:

"All right. So here is the problem.

"We have all these Lemon Law cases against Ford, and the Lemon Law cases are individual consideration cases. [¶] Has Ford had an opportunity to correct the defect? How many times has the car been taken to the dealer? Who is the defendant? Is it the dealer who failed to maintain or is it the Ford Motor Company that in some way created a defective vehicle, a lemon? [¶] So what you have is you have every case is different.

"Yes, there can be one common protective order, but you don't need a complex court for that.

"And so because every case is different, the Court can't manage these cases in the way that the complex courts generally manage.

"If we have a series of cases that can be managed by the Court, cases with a common—for example, if this were a products liability case we could suspend any discovery on

5

anything other than the specific defects and then Ford could have discovery in that one area.  We could determine whether there was some sort of design defect in this transmission.

"The Court commonly handles multiple plaintiff tort cases where the torts are all the same.  [¶]  The Court commonly handles class actions where, you know, you have CLRA claims, fraud claims, although fraud doesn't generally work for class actions.

"The point is Lemon Law cases are not amenable to complex management, because I can't look at specific issues that I can solve.  [¶]  For example, where we have one motion or we take a bellwether, one case, and that could be applied to all the rest.

"Instead we have cases with many, many different components that are not the same, different dealers, different repair histories, some with no repair histories.

"There is no way to manage these cases.  It would be like saying every single Lemon Law case against Ford should be in one court.  And you would have one court.  It's the Ford court handling Lemon Law cases.

"Then we would still need to worry about discovery which is individualized.

"There is no legal issue that we can decide that will decide all of the cases.

"In short, in my view these cases should not have even been coordinated in the first place."

The court also observed that Judge Elias's ruling was "not an issue here because Judge Elias' ruling is complete.  I have these cases.  [¶]  The question is do I add more to them, because

6

as I see it . . . before the year is over I would have another thousand cases. [¶] Then I would wind up doing nothing but litigating these individual cases. [¶] . . . [¶] . . . [A]t this stage I'm only concerned with whether I should add more of the same. [¶] And also what I have in front of me is slightly different than what Judge Elias had, because with Judge Elias there were product liability cases included."[2]

Judge Freeman took the matter under submission and a month later denied the petition, finding the criteria for coordination under section 404.1 were not satisfied, and that the cases were not complex under the rules of court. (Cal. Rules of Court, rule 3.400.)[3]

Judge Freeman found only one coordination criterion was satisfied: the relative development of the actions and the work product of counsel favored coordination, as the great majority of the add-on cases were recently filed with no trial date, and in the others no depositions or vehicle inspections had occurred. The court found all the other factors weighed against coordination. Specifically, the court concluded that:

---

[2] The record does not show that the cases coordinated by Judge Elias included product liability claims. According to the petition for writ of mandate challenging the coordination order, the cases were "simple breach of warranty cases brought under California's lemon law . . . ." As demonstrated in the caption, the Judicial Council Coordination Proceeding designation for these cases is "Ford Motor Warranty Cases," thus making clear these cases all involve claimed breaches of warranty.

[3] All further references to rules are to the California Rules of Court.

7

First, "litigating issues regarding the defective transmissions will inherently be heavily individualized as to each individual vehicle, and would not be a predominating fact significant to this litigation. To the contrary, the Court would be required to consider, among other factors, the specific design or manufacturing problem with each vehicle and any representations made by the Defendant (as well as the dealer) leading up to the purchase of each vehicle."

Second, "there would be great inconvenience to counsel, parties, and witnesses in having to travel from different counties to litigate their claims in Los Angeles (especially given that a large number of the cases originated in San Diego, Riverside, and San Bernardino)."

Third, "[i]t would not be more convenient to have all of these cases coordinated before a single trial judge, as it would not make efficient use of judicial facilities and manpower."

Fourth, "[t]here is not a significant risk that there would be duplicative and inconsistent rulings regarding Ford's liability if individual cases were allowed to go forward outside of the coordination process (again, given the issues specific to each vehicle and to each filed case)."

Fifth, "the Court is not persuaded that settlement would be more likely in a coordinated proceeding than if the cases were individually allowed to proceed."

Finally, the court stated that it could not "make the finding that the cases are all 'complex' under [rule] 3.400. It is not at all apparent that the cases would require numerous pretrial motions raising difficult or novel legal issues with respect to the model year transmissions."

Thus, the court determined "that, on balance, the criteria under [section] 404.1 are not satisfied, and that coordination of the add-on cases is not appropriate."

Three weeks later, Ford filed a petition for writ of mandate directing the trial court to vacate its ruling and to grant the add-on petition, or in the alternative, to reconsider the add-on petition consistent with the coordination rules and other legal authorities.

We directed real parties in interest to file a preliminary response to the petition and permitted Ford to file a reply. We then issued an alternative writ, directing the trial court either to vacate its order and enter a new order granting Ford's petition, or to show cause before this court why a peremptory writ requiring the court to do so should not issue.

The trial court declined to comply with the alternative writ. A letter from court counsel stated: "The cases in the granted original coordination petition were coordinated based upon causes of action against Ford alleging product liability and design defect issues, which was appropriate for coordination. However, the appropriate cases were mixed in with standard 'Lemon Law' cases that were based upon individual dealer's alleged failing to fix specific problems after a reasonable number of tries. Such cases achieve no benefit from coordination because individual issues predominate; each rises and falls on a particular dealer's ability to correct a particular problem."[4] Counsel further stated

---

[4] We are perplexed by the trial court's statement that the coordinated cases include product liability claims, as the record and the parties' briefs demonstrate that is not the case; and also by the trial court's statement that product liability cases are appropriate for coordination but lemon law cases are not. Both

9

the trial court believed it would be helpful if the parties briefed the issue of the court's discretion to deny an add-on petition in these circumstances, and requested that we publish our opinion to provide guidance to the coordinating court.

Real parties in interest then filed a written return to the petition, and Ford filed its traverse.

## DISCUSSION

### 1. The Governing Legal Principles

Section 404 governs a petition for coordination, and requires it to be supported by a declaration "stating facts showing that the actions are complex, as defined by the Judicial Council[5] and that the actions meet the standards specified in Section 404.1." The Chairperson of the Judicial Council then assigns, or authorizes the assignment of, a coordination motion judge "to determine whether the actions are complex, and if so, whether coordination of the actions is appropriate . . . ." (§ 404.)

The coordination standards specified in section 404.1 have been recited above. The same coordination standards apply to a decision whether to grant a request to coordinate an additional action. Section 404.4 provides in pertinent part that: "[t]he presiding judge of any court in which there is pending an action sharing a common question of fact or law with actions coordinated pursuant to Section 404, on the . . . motion of any

---

product liability and lemon law cases involve defective products with common issues, as discussed more fully below.

[5]      Rule 3.400 defines a complex case as "an action that requires exceptional judicial management to avoid placing unnecessary burdens on the court or the litigants and to expedite the case, keep costs reasonable, and promote effective decision making by the court, the parties, and counsel." (Rule 3.400(a).)

10

party supported by an affidavit stating facts showing that the action meets the standards specified in Section 404.1 . . . may request the judge assigned to hear the coordinated actions for an order coordinating the action.  Coordination of the action shall be determined under the standards specified in Section 404.1."

Similarly, rule 3.501 defines an "[a]dd-on case" as "an action that is proposed for coordination, under . . . section 404.4, with actions previously ordered coordinated."  (Rule 3.501(2).) Rule 3.521 governs the contents of petitions for coordination, including "a request that a coordination trial judge make such a determination concerning an add-on case . . . ."  (Rule 3.521(a).) Such petitions must be supported by a memorandum and declarations showing "[t]he facts relied on to show that each included action meets the coordination standards specified in . . . section 404.1 . . . ."  (Rule 3.521(a)(7).)

Rule 3.544 governs add-on cases, specifying that requests to coordinate add-on cases must comply with the requirements of the rules governing an original petition for coordination.  (Rule 3.544(a).)  Rule 3.544 also specifies that, "[i]n deciding the request to coordinate, the court must consider the relative development of the actions and the work product of counsel, in addition to any other relevant matter."  (Rule 3.544(c).)

Also pertinent to our decision in this case is *McGhan Medical Corp. v. Superior Court* (1992) 11 Cal.App.4th 804 (*McGhan*).  In *McGhan*, the petitioners sought—and obtained— reversal of a superior court order denying coordination.  *McGhan* involved a petition for coordination of at least 300 separate cases, pending in over 20 California counties, with "additional cases . . . being filed almost daily."  (*Id.* at p. 807.)  The complaints sought damages for personal injuries sustained by women who had

11

breast implants.  The defendants were "various manufacturers of the implant devices, producers of implant materials, and physicians who prescribed or administered the implants."  (*Ibid.*) Some cases involved multiple plaintiffs, and most "join[ed] either several or numerous defendants," so that "the number of parties involved must run in the thousands."  (*Ibid.*)

The trial court in *McGhan* denied the coordination petition on the ground that "common question[s] of fact or law" (§ 404.1) did not predominate, " 'in that the cases involve different implants, different designs, different warnings, different defendants, different theories of defect, different modes of failure, and different injuries.' "**6**  (*McGhan, supra,* 11 Cal.App.4th at p. 808.)

The Court of Appeal reversed the trial court's order, remanding the case with instructions to order all the cases

---

**6**    The trial court in *McGhan* further explained that while there were certain common issues, " 'the differences among the cases and the sheer number of them, presently pending around the state and those yet to be filed, are such that coordination would be impractical and would result in unnecessary delay of discovery and of trial.  [¶]  The unmanageability of this large number of cases would provide none of the economies of scale which are the goals of coordination.  [¶]  . . .  [¶]  Additionally, . . . coordination would inconvenience the plaintiffs, their counsel, defendant health care providers and witnesses by requiring them to travel to a selected site or sites to process their cases; would tax judicial resources by sending hundreds, and possibly a thousand cases, to one county, and any possibility of duplicate and inconsistent rulings, orders, or judgments can easily be addressed and minimized by the relatively few judges hearing the breast implant cases filed in the various California courts.' " (*McGhan, supra,* 11 Cal.App.4th at p. 808, fn. 2.)

12

coordinated and, as discussed *post*, expressly rejecting the trial court's assessment of several of the section 404.1 coordination standards.  (*McGhan, supra,* 11 Cal.App.4th at pp. 812-814.)

**2.     The Standard of Review**

The *McGhan* case establishes that our review of the trial court's order denying coordination of the add-on cases is de novo.

In *McGhan,* the court explained, at considerable length, that plenary review of the coordination motion judge's order denying coordination was appropriate.  (*McGhan, supra,* 11 Cal.App.4th at pp. 808-811.)  We will not reiterate that discussion, except to commend its analysis and note our agreement with its conclusions, namely:  "The specific discretionary call in this case was the ultimate conclusion that the benefit to be derived by coordination was outweighed by complications and problems the judge anticipated would result from attempted coordination.  This decision, we apprehend, is one not necessarily made better by a trial court judge than by an appellate tribunal. . . .  [T]his is a decision which requires the 'exercise [of] judgment about the values that animate legal principles,' and hence ' "the concerns of judicial administration . . . favor the appellate court, and the question should be classified as one of law and reviewed de novo." ' "  (*Id.* at p. 811.)

Here, real parties in interest point out this case is in a different posture, and contend we should review the trial court's decision for abuse of discretion.  They point to *McGhan's* observation that, "[o]nce coordination is established and commenced, the then rulings of the coordinating judge will most likely not be the mixed bag of law and fact . . . .  They will be administrative rulings in the process of the hands-on control of specific cases by a trial judge.  We would expect that such rulings

13

would be reviewable only upon a basis of according substantial deference to the trial court's opinions." (*McGhan, supra,* 11 Cal.App.4th at p. 814.)

We do not disagree with that principle. But we do not consider a ruling on an add-on petition to be within *McGhan*'s contemplation when it referred to "administrative rulings in the process of the hands-on control of specific cases . . . ." (*McGhan, supra,* 11 Cal.App.4th at p. 814.) On the contrary, as real parties in interest themselves insist, the same section 404.1 coordination standards apply to add-on cases as apply in an original coordination petition. No reason appears for us to apply a different standard of review to the denial of an add-on petition than the standard of review that applies to the denial of an original coordination petition.

## 3.    **This Case**

Ford's writ petition contends the add-on cases asserted "substantively identical claims for breach of warranty related to the DPS6 transmission" as were asserted in the cases Judge Elias determined should be coordinated, and were pending in the same counties. Ford contends Judge Elias would have coordinated the add-on cases if they had been included in Ford's original petition, and Judge Freeman "instead conducted [his] own reconsideration of Judge Elias's February 4, 2016 Order," and "failed to apply the correct legal calculus . . . ."

Real parties in interest, on the other hand, contend that Judge Elias's order "is simply not at issue"; appellate review "must focus solely on [Judge Freeman's] written order," not on his comments from the bench during the hearing; and his ruling denying coordination of the add-on cases "correctly applied . . . controlling law."

14

We agree with Ford that the trial court erred in refusing to coordinate the add-on cases.

### a. The inconsistent rulings

We agree with real parties in interest on one point: as a general matter, in deciding whether to add cases to a coordination proceeding, courts are to apply the standards specified in section 404.1. That much is clear from the face of the statutes and rules we recited in part 1, *ante*. But in addition, as Ford points out, in considering add-on cases, rule 3.544(c) expressly requires the court to consider one of the section 404.1 factors—"the relative development of the actions and the work product of counsel." This suggests the primacy of that factor in determining the propriety of adding a case or cases to a coordination proceeding.

That primacy makes a good deal of sense where the proposed add-on cases have no meaningful differences from the cases already being coordinated. Where the cases are substantively alike, most other coordination standards—that is, the common question of law or fact predominating; efficient utilization of judicial facilities and manpower; the disadvantages of duplicative and inconsistent rulings—are unlikely to be different from those existing when the original coordination order was made. On the other hand, counsel may have devoted extensive resources in discovery and other trial preparation in some or many of the add-on cases, and those cases may have trial dates. Adding such cases to the coordination proceeding may result in costly duplication of efforts and delay in resolution of those cases.

Here, the proposed add-on cases are substantively no different than those in the original coordination order. On the

15

record before us, we find no basis to conclude that adding them to the coordination proceeding will result in delay or duplication of effort. The coordinated proceeding has been stayed since April 27, 2016, so there is no risk that new counsel representing plaintiffs in the add-on cases will seek to depose witnesses whose depositions were already taken. The add-on cases had been recently filed or had previously set trial dates vacated. If any of the add-on cases has had a trial date set during the pendency of this writ proceeding, or if other developments in any add-on case renders such case unsuitable for coordination, then the coordination trial judge may consider whether to exclude that case from the coordination proceeding.

Judge Elias concluded that coordination of the original 470 cases was "proper and would benefit the goals of the Coordinated Cases . . . ." While her order was short and succinct, it indicates the judge "read and reviewed all of the papers"; "heard the concerns of [Ford] that it is more efficient and cost effective to have all of the cases in front of one judge"; and "also heard the points made by the Plaintiffs that it would not be fair to require plaintiffs in small counties and with few cases to have to travel to Los Angeles or other large Metropolitan areas to have their matters adjudicated." We necessarily presume that the conclusion of the coordination motion judge—the judge specifically designated "to determine whether coordination is appropriate" (rule 3.501(7))—was based on evaluation of the requisite section 404.1 factors.

Six months later, Judge Freeman concluded, applying the same section 404.1 factors, that *none* of them supported coordination of additional, substantively indistinguishable cases,

16

except for the factor given primacy in rule 3.544(c): the fact they were recently filed.

We find it difficult to avoid the conclusion that Judge Freeman's order was a direct repudiation of the coordination motion judge's (Judge Elias's) order. Real parties in interest assert that "disagreement with the original coordination order was never a basis for [Judge Freeman's] actual order . . . ." We believe otherwise. Judge Freeman's tentative decision was to deny coordination of the add-on cases. His statement from the bench, after summarizing his view of the matter, was that: "In short, in my view these cases should not have even been coordinated in the first place," and "at this stage I'm only concerned with whether I should add more of the same." His final written decision was exactly the same as his tentative decision. We cannot view his statement as "an isolated comment from the bench" that is without significance.

The way we see it, after the duly-assigned coordination motion judge determined the cases in the original petition were complex and coordination was appropriate, the judge who was subsequently assigned to handle the coordinated proceedings instead rejected the determination that coordination was proper. We cannot countenance the implicit reversal of a decision by the duly-assigned coordination motion judge, particularly since a mandamus petition challenging that decision was filed (as expressly permitted by section 404.6) and denied. Thus, the coordination proceeding was duly established.

As is apparent, the coordination statutes and rules expressly contemplate add-on cases. Unless there is some distinction between the coordinated cases and the add-on cases— and none has been suggested here—we are unable to see any

17

basis for the coordination trial judge's refusal to add cases to the coordination proceeding. Yet that is precisely what has been done.

We realize, of course, that there are circumstances where the addition of a substantively similar case would be properly rejected by the coordination trial judge—such as if the case is ready for trial, or some other feature distinguishes it from the cases in the coordination proceeding. But the coordination statutes and rules simply do not contemplate a decision by the coordination trial judge to constrict a duly-constituted coordination proceeding by refusing to include "more of the same."[7]

### b.     The "complex case" issue

At its core, the trial court's refusal to coordinate the add-on cases appears to lie in its belief that lemon law cases are not complex cases within the meaning of rule 3.400. At the hearing, the court stated that it "can't manage these cases in the way that the complex courts generally manage," and "[t]he point is Lemon Law cases are not amenable to complex management," and "[t]here is no way to manage these cases." Likewise, in its written ruling the court stated it "cannot make the finding that the cases are all 'complex' under [rule] 3.400."

First, it is not the province of the coordination trial judge to determine that add-on cases that are substantively

---

[7]     Rule 3.542 provides a pertinent analogy. That rule allows the coordination trial judge to remand a coordinated action to the court in which it was originally pending, but "[n]o action . . . may be remanded over the objection of any party unless the evidence demonstrates a material change in the circumstances that are relevant to the criteria for coordination under . . . section 404.1."

18

indistinguishable from cases already subject to coordination are not complex cases. Section 404 authorizes the coordination motion judge—Judge Elias—"to determine whether the actions are complex, and if so, whether coordination of the actions is appropriate . . . ." In the context of a request for coordination of add-on cases, the statutes and rules do not contemplate a further determination of whether the add-on actions themselves are complex. The only criteria to be applied are the coordination standards specified in section 404.1. (See § 404.4 ["Coordination of the action shall be determined under the standards specified in Section 404.1."].)

Second, we are compelled to point out the trial court's apparent misunderstanding of the nature of the coordinated actions and those proposed to be added. As noted earlier, Judge Freeman and court counsel have asserted that the cases before Judge Elias included product liability cases as well as lemon law cases, and took the view that the former are amenable to coordination while the latter are not. The court's position has two flaws.

The first flaw is factual. As described above in the Factual and Procedural Background, the record does not support the assertion that the cases before Judge Elias included product liability cases. Indeed, at the hearing before Judge Elias, plaintiff's counsel, arguing against coordination, made that clear: "The fact is they are individual cases. The issues are going to be individual. [¶] And the claim is a Song-Beverly Consumer Warranty Act claim, not a product liability claim involving a transmission but individual Song-Beverly claims . . . ."

The second flaw is more significant. We see no basis for concluding that, while product liability cases are suitable for

19

coordination, lemon law cases are not.  Both product liability and lemon law cases involve defects.  The defect in a product liability case may be in design or manufacture, while in lemon law cases, the defect is described in terms of a departure from warranty that substantially impairs the use, value or safety of the car.  Certainly the latter cases raise individual issues, but so do product liability cases.  Just as in the asbestos cases and the breast implant cases in *McGhan*, a great deal of efficiency can be accomplished by coordinating lemon law cases, as we discuss, *post*, despite individual issues relating to repair histories.  At oral argument, real parties in interest were unable to explain why it was beneficial to coordinate the asbestos and breast implant cases, but not these lemon law cases.  In short, product liability cases filed by many individual plaintiffs are recognized as complex, and there is no reason why multiple-plaintiff lemon law cases should be treated differently.

We also note the coordination trial judge gave only one reason for concluding the add-on cases were not complex under rule 3.400:  that "[i]t is not at all apparent that the cases would require numerous pretrial motions raising difficult or novel legal issues with respect to the model year transmissions."  The reason cited by the court is only one of five factors, "among other things," that a court must consider in deciding whether an action is a complex case.  (Rule 3.400(b).)  It is not a necessary factor.  (See *Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 835, fn. 8 [rejecting the notion that coordinated actions must necessarily be "difficult or novel"; "The coordinated actions with which we are here concerned are 'complex' within the meaning of this rule only because of the large number of represented parties in related actions pending in different counties."].)

20

In sum, the determination whether cases are complex was a determination for the coordination motion judge. That finding was made, and was clearly proper. The coordination trial judge is not at liberty to make a contrary finding with respect to substantively indistinguishable add-on cases.

### c.    The section 404.1 standards

Even if we ignore the inconsistency between the order establishing the coordination proceeding and Judge Freeman's order, we would conclude the latter cannot stand. The section 404.1 coordination standards, properly applied, plainly favor coordination of the add-on cases.

### i.    The common questions of fact or law

As the trial court acknowledged, all the add-on cases (like the coordinated cases), are "Lemon Law" cases that "deal with defects in the transmissions of the identified model-year Ford Fiesta and Ford Focus vehicles." Nonetheless, the court found this factor "weigh[ed] against coordinating the cases," because "litigating issues regarding the defective transmissions will inherently be heavily individualized as to each individual vehicle, and would not be a predominating fact significant to this litigation." As discussed below, even real parties in interest concede there are common discovery issues involving the design and modification of the transmission and Ford's repurchase policies and procedures.

Ford's original coordination petition emphasized the coordination of pretrial motion practice, written discovery and common depositions. Perhaps more significantly, real parties' own position in the June 15, 2016 joint initial status conference report in the coordination proceeding, while proposing a "dual-

21

track approach" for discovery on non-common issues, confirms the importance of common issue discovery.

For example, real parties in interest pointed out that each plaintiff may recover treble damages by showing Ford willfully failed to comply with its statutory obligation to replace or repurchase a vehicle, and relevant factors in assessing willfulness "include the existence and contents of Ford's repurchase policies and Ford's knowledge of unrepairable defects. . . .  Consequently, *each included action requires discovery into 'common' issues such as the design and modification of the dual-clutch transmission, Ford's knowledge of defects with the dual-clutch transmission, and Ford's repurchase policies and procedures.*"  (Italics added.)

"Common issue discovery," real parties in interest stated, "should be divided into two phases," the first geared toward immediate production of material that Ford has already produced "plus routine foundational matters such as database locations, custodians, search terms, and document retention policies," and the second phase targeting "subject matter, data sources, time frames, and witnesses not included in Ford's initial production." The initial phase of discovery, according to real parties in interest, "will focus on the design, testing, implementation, failure and modification of the dual-clutch transmission and is anticipated to comprise the more than two-million pages of documents Ford has already . . . produced in . . . federal class actions."

Real parties in interest further proposed that a global protective order be presented to the court, followed by Ford's production of its document retention policies, the documents produced in the class action cases, a privilege log and all documents Ford was ordered to produce in any individual action

22

before the coordination stay.  Real parties in interest proposed further details concerning common issue discovery on the dual-clutch transmission, as well as on Ford's "internal policies regarding vehicle repurchases and lemon law compliance as well as the policies, training materials, scripts, organization charts, and related materials" governing a specified Ford subsidiary.

Ford's views on discovery and the scope of the proposed protective order were significantly different,[8] but the controlling point is clear:  the cases are ripe for coordination on discovery and related pretrial matters.  A "continued" joint initial status conference report for the July 8, 2016 hearing included charts prepared by plaintiffs "categorizing cases by alleged defect and causes of action," as well as materials further reflecting the parties' respective positions on discovery, a proposed protective order and a case management plan.

All this clearly demonstrates the benefits of early coordination of discovery and motion practice—benefits that are in no way negated by the court's concern over litigation that is "heavily individualized as to each vehicle."  (See *McGhan, supra,*

---

[8]     Among other things, Ford proposed production of all vehicle-specific documents and plaintiff-specific information before plaintiffs conduct liability and damages discovery. Providing such information "at the outset will permit the parties and the Court to properly identify relevant subcategories of cases, promote early settlement or other disposition of cases, limit the need for individualized discovery as to each Plaintiff, and otherwise permit orderly and efficient discovery.  For example, to the extent numerous Plaintiffs' vehicles were repaired at a single third-party facility, the parties would be able to seek production of relevant repair records for multiple Plaintiffs through a single subpoena rather than in multiple, intermittent requests, thereby limiting the burden on those third parties."

11 Cal.App.4th at pp. 808, 811 [rejecting coordination motion judge's conclusion that common questions did not predominate because breast implant cases involved " 'different implants, different designs, different warnings, different defendants, different theories of defect, different modes of failure, and different injuries' "].)  As in *McGhan*, while "all determinations as to whether to coordinate a case are but best estimates" (*id.* at p. 813), it seems obvious that "the preparation for trial in terms of depositions, interrogatories, admissions, collection of physical data, etc., will be better achieved if done in a coordinated manner" (*id.* at p. 814).

### ii.    Convenience of parties, witnesses and counsel

The trial court's finding that the convenience factor weighed against coordination of the add-on cases is similarly flawed.  The court merely found that traveling from other counties to Los Angeles would be a "great inconvenience" to counsel, parties, and witnesses.  But with today's technology, there is no reason why counsel, parties and witnesses should have to travel frequently to Los Angeles.  The complex courts in Los Angeles have used electronic filing and email for years now, pretrial and post-trial court appearances may be made by telephone or video using CourtCall, and many judges accept conference calls to informally resolve discovery disputes.  Counsel and the court may take advantage of technology to devise means to coordinate discovery and other pretrial practice so as to avoid "great inconvenience."  (See Tech Tips From the Bench:  An Interview with Hon. Emilie Elias, ABTL Report Los Angeles, Summer 2015 <http://www.abtl.org/report/la/abtlla_summer2015.pdf>[as of May 8, 2017].)  The Judicial Council

recommends the court consider the use of a website for coordinated complex cases, with the parties responsible for its maintenance and cost. The Judicial Council has described at length many other uses of technology to manage discovery, pretrial and trial of complex cases. (Judicial Council of Cal., Deskbook on the Management of Complex Civil Litigation (2016), §§ 3.90-3.99 (Deskbook).)

As *McGhan* observed 25 years ago: "That [the coordinating judge] probably will elect to centralize and coordinate discovery and motion practice does not require burdensome travel. There is no reason why the coordinating judge cannot prescribe special rules by which discovery materials are lodged in a document center available to all counsel in their offices through computer networking . . . ." (*McGhan, supra,* 11 Cal.App.4th at p. 813.) The same is true today in spades.[9]

### iii. Efficient utilization of judicial facilities and manpower; the calendar of the courts

The trial court's analysis of the efficiency factor consisted of the single statement that coordination before a single judge

---

[9]    Real parties in interest contend that coordinated proceedings "take much longer to resolve than individual Lemon Law cases," and this delay is "highly prejudicial to the individual plaintiffs who rely on their vehicles in their daily lives." The trial court made no mention of delay as a justification for its ruling. (See *McGhan, supra,* 11 Cal.App.4th at p. 813 [acknowledging that some delay in certain cases might be experienced, but viewing "this potential detriment to the few to be a modest price to pay for the efficiency to be gained by the majority of cases through coordination"]; *ibid.* ["One of the purposes . . . of a centralized coordinating authority is to vest in one administrator the power to organize the litigation in an efficient and equitable manner, for the benefit of all."].)

"would not make efficient use of judicial facilities and manpower."

Coordination does not mean that all the cases must be tried in one forum. Ford proposed that up to ten cases per side be selected for bellwether trials. A fair and efficient trial structure is needed for complex cases that involve numerous parties and issues. The Judicial Council has suggested that counsel and the court consider "the trial of one or more test cases, with appropriate provision being made concerning the res judicata or collateral estoppel effects of a judgment on plaintiffs and defendants." (Deskbook, *supra*, § 2.61.) In addition to deciding which case or cases to try first, coordination will enable the parties to consider stipulations of facts that need not be proven and other procedures to expedite the presentation of evidence, to obtain rulings on motions in limine, and to develop jury questionnaires, jury instructions, special verdicts and interrogatories that may be used in future trials. (*Ibid.*)

*McGhan* pointed this out, stating: "That these cases may be coordinated does not mean they need be tried in one forum; it does not even indicate that ultimate trial of the cases need be unified." (*McGhan, supra,* 11 Cal.App.4th at p. 813.) Further, "the procedures which may be utilized by the coordinating judge are flexible indeed." (*Id.* at p. 812.) *McGhan* pointed out the rules would permit the coordination trial judge to order any issue or defense tried separately; order hearings conducted at various sites in the state to provide convenience to witnesses, parties and counsel; "prescribe all manner of pretrial discovery devices designed to aid the litigation"; sever cases or claims and transfer them back to their original venue; and try specific issues separately. (*Ibid.*) The coordination trial judge is vested with

26

"whatever great breadth of discretion may be necessary and appropriate to ease the transition through the judicial system of the logjam of cases which gives rise to coordination."[10]  (*Ibid.*)

### iv.    Other section 404.1 factors

The trial court noted two other factors as weighing against coordination of the add-on cases:  "There is not a significant risk that there would be duplicative and inconsistent rulings regarding Ford's liability" in the absence of coordination, "given the issues specific to each vehicle and to each filed case[]."  Once again, this ignores "the disadvantages of duplicative and inconsistent rulings" (§ 404.1) on discovery and other pretrial matters that precede determinations of Ford's liability.

And finally, the court was "not persuaded that settlement would be more likely in a coordinated proceeding than if the cases were individually allowed to proceed."  According to a joint supplemental report prepared for the July 29, 2016 hearing, at least 219 of the originally coordinated cases had settled, and as of March 7, 2017, approximately 254 of the cases subject to the add-on petition had been settled or dismissed.  We do not know if any

---

**10**    The trial court acknowledged that "the law permits us to do that" (send cases back to the original courts for trial), but stated it was "not economically feasible under our current operating procedures" to send cases from the coordination judge's courtroom to the various trial courts in the Stanley Mosk Courthouse.  We do not understand this remark.  The coordinated cases do not all have to be tried in the Stanley Mosk Courthouse, or even in Los Angeles Superior Court.  The chart prepared for the July 8, 2016 status conference showed there were 79 cases pending in Los Angeles Superior Court that Ford proposed to add to the coordination proceeding.  It would seem to be more economical for those 79 cases to be coordinated in one courtroom, even if some must be returned to their originally assigned courts for trial.

27

of these cases would have settled if the original coordination petition had been denied, but we find no basis to conclude that settlement would be more likely without coordination, which is the standard specified by section 404.1. There are many ways by which a coordination trial judge may serve as a catalyst for settlement discussions without interfering with the steady progress of the cases toward trial. (Deskbook, *supra*, §§ 2.90-2.95.)

### d. Conclusion

The benefits of coordination of these lemon law cases involving defective DPS6 transmissions is plain. The parties' joint filings in the coordination proceeding demonstrate the existence of common discovery issues, and it is incontrovertible that coordinated management of discovery on those issues will minimize the disadvantages of duplicative and inconsistent rulings and promote the efficient utilization of judicial facilities and manpower. These benefits are not unlike those that have resulted from coordination of the Asbestos Litigation, where the coordination motion judge found coordination appropriate because the cases "as a group" were complex and involved significant common pretrial issues that should be heard by a single judge. That is the case here.

We reiterate that we do not mean to restrict the court's discretion to determine that specific add-on cases are not suitable for coordination.[11] Nor do we in any way restrain the court's

---

[11] Real parties in interest tell us in their return that "most of the add-on cases now have imminent trial dates." Rule 3.521(d) provides that "[t]he imminence of a trial in any action otherwise appropriate for coordination may be a ground for summary denial of a petition for coordination, in whole or in part." Nothing we

28

discretion to determine matters related to trial of the cases. We say only that, absent some distinguishing feature, the court may not reject a petition to coordinate substantively identical add-on cases by redetermining the fundamental issue already decided by the coordination motion judge: that lemon law cases involving allegedly defective DPS6 transmissions, in the nine counties subject to the coordination proceeding, are complex cases and are appropriate for coordination. The court identified no distinguishing feature in the add-on cases that would support the court's analysis of the section 404.1 coordination standards, and we conclude that analysis was erroneous. Accordingly, we grant Ford's petition.

## DISPOSITION

The order to show cause is discharged. Let a peremptory writ of mandate issue directing the trial court to vacate its August 29, 2016 order denying Ford's petition for coordination of add-on cases, and enter a new and different order granting the petition, subject only to the exclusion of any action based on an imminent trial date or other distinguishing feature rendering the action unsuitable for coordination. Ford shall recover its costs.


GRIMES, J.

I CONCUR:


BIGELOW, P. J.

---

say here prevents the coordination trial judge from applying this rule to any action in the add-on petition.


29

**Ford Motor Company v. Superior Court**

**B277725**


**FLIER, J., Concurring**


Although I find procedural and substantive deficiencies in Ford Motor Company's (Ford's) add-on petition, I concur in the result.  Because the coordinated proceeding was stayed shortly after the original coordination order and remains stayed, the " 'relative development of the actions and the work product of counsel' " should have been the primary consideration in evaluating Ford's add-on petition (as the majority concludes). (Maj. opn., *ante*, at p. 15, quoting Cal. Rules of Court, rule 3.544(c).)

In this case, the trial court concluded that the relative development of the actions "weigh[ed] in favor of coordination," and the record supported that conclusion for most of the proposed add-on cases.  For that reason only, I concur that the add-on cases should have been coordinated.  Further, as the majority states, the trial court retains "discretion to determine that specific add-on cases are not suitable for coordination."  (Maj. opn., *ante*, at p. 28.)


FLIER, J.

1